[No. 1793.]

John Stevenson *v.* The State.

1. Murder — Self-defense — Charge of the Court.— Homicide is justified when the slayer kills the deceased while the deceased is in the act of killing him or doing him some serious bodily injury, or when the slayer kills the deceased *after* the latter has done some act showing evidently an intention to take his life or do him some serious bodily injury. A charge of the court upon this subject which omits the word "after" is erroneous because it limits the justification to a killing while the deceased is in the act of killing

the slayer, or in the act of doing the *act* which evidences his intention to kill the slayer or do him serious bodily harm. See the opinion *in extenso* on the question; and see, also, a charge of the court on self-defense, *held* defective in this particular.

2. Same — Terms Defined.— The terms "reasonably" and "necessarily" are essentially different in meaning, in that the former imports "in a reasonable manner," "consistent with reason," while the latter imports "necessity," "inevitably," "such as must be," "impossibility of being otherwise." The first subdivision of article 570 of the Penal Code, defining justifiable homicide, declares that "it must *reasonably* appear by the acts, or by words coupled with the acts, of the person killed, that it was the purpose and intention of such person to commit one of the offenses above named." *Held,* that the trial court erred in its charge in substituting the word "necessarily" for the word "reasonably."

3. Same— Principal Offenders.— Upon the subject of principal offenders the court charged the jury, in effect, that if they believed, from the evidence, that the defendant and one Hunt, acting together in such manner as to make him a principal, did strike with a gun and cut with a knife the said Holmes, thereby causing the death of the said Holmes, and that said acts were prompted by malice express, they should find the defendant guilty of murder of the first degree, but if upon implied malice, they should find the defendant guilty of murder of the second degree. *Held,* that the charge as a proposition of law is correct.

4. Same — Conspiracy.— It is an accepted doctrine that "if two or more conspire and confederate to commit an offense, and such offense is committed, all present are guilty as principals, and each party is responsible for collateral acts, growing out of the general or common design, but not for independent acts growing out of the particular malice of individuals." It is equally well settled that it is incumbent upon the trial court to charge the jury upon every phase of case made by the evidence. See the opinion *in extenso* for two theories arising upon the evidence, in so far as there was evidence of a conspiracy, which demanded correct charges from the court.

Appeal from the District Court of Navarro. Tried below before the Hon. L. D. Bradley.

The indictment in this case, filed August 22, 1883, charged the appellant and Joe Hunt, jointly, with the murder of Joe Holmes, in Navarro county, Texas, on the 25th day of July, 1883. At the December term, 1884, of the Navarro county district court, the appellant, a severance being had, was placed upon his trial, and was found guilty of murder in the second degree, and awarded a term of five years in the penitentiary as his punishment.

Cary Collins was the first witness for the State. He identified the defendant on trial as John Stevenson, the party charged in the indictment. On Saturday, July 28, 1883, the day of the homicide, the deceased and the witness went to the town of Corsicana and remained until evening, when they started on their return home. Jeff Hartsell, Joe Hunt and Oliver Glenn were in town in a wagon.

The deceased purchased a sack of flour and the witness a can of lard, which they placed in Hartsell's wagon to be taken out for them and left at either Cary Johnson's or Jake Overby's. The wagon left Corsicana before the witness and the deceased did. When witness and the deceased reached the edge of town, they overtook Petty and McElroy, and rode a short distance with them. The deceased rode on ahead of witness, and witness did not overtake him until he reached Mr. Melton's place. Deceased and Joe Hunt had just had a fight, or so the deceased told witness as the two rode on together. Hunt and the wagon had gone on ahead. Witness and the deceased overtook the wagon again at Mr. Wimberly's place, some distance farther on the road home. Joe Hunt, Jeff Hartsell and Oliver Glenn were in the wagon. Here loud talking was indulged in, and the witness was told about the fight between Hunt and deceased. Witness and the deceased rode on ahead of the wagon, and at a distance of about three hundred yards from Wimberly's they stopped at Stoke's gate. While there the wagon drove up and stopped. The three parties named who were in the wagon, and the deceased and the witness, were present. The deceased and Hunt then made friends. Witness took occasion to tell Hunt that he had nothing against him, Hunt, and for him, Hunt, to go on home. The parties then separated, the wagon going on down the road, and the deceased in advance of it. The witness went through Stoke's gate, and through his pasture to his home.

Witness remained at home about fifteen minutes, and concluded to go hunting. It was now near dusk. Witness got his gun, but in looking for ammunition could find no shot. He then went to Mr. John White's house, where he obtained some small shot and powder, and from there went to Anderson Cole's, where he stayed until about one hour after night. Thence the witness went to Cary Johnson's to see if his lard had been left there, and, if so, to get it. He met the deceased in the road and the two went together to Johnson's, the one to get his lard, the other to get his flour, which were to have been left there by the parties in Hartsell's wagon. When arrived at Johnson's, they were informed that the articles had not been left there. It was now long after dark. From Johnson's witness and deceased went on to Jake Overby's, and asked if the articles had been left there. Overby said not. After talking awhile witness started home, but just then heard a halloo up the valley, and Overby remarked: "There are the boys now. They have evidently been drinking, and, as my wife is sick, I had much rather they would not come here."

Witness and the deceased then rode up the road, meeting the wagon. Witness remarked to the deceased: "Now, if they see us both with our guns they will think something is wrong; so I will lay mine down." Witness dismounted and laid his gun down, and said to the deceased: "Now, you ride on by the wagon, and I will stop it and ask for our things." The deceased rode on by the wagon, and the witness heard the defendant, who was riding horseback behind the wagon, call out: "Is that you, Joe Holmes?" to which inquiry he heard the deceased reply: "Yes." The defendant then said: "Yes, it is you, and you have got a gun; what are you doing with that gun here?" Deceased replied: "I have nothing against you, Stevenson." The defendant retorted: "Oh! but I'm a man, and I know what you have got that gun for." He then rode up to the deceased, caught his gun, wrested it from his hands, and struck him with it over the head, knocking the deceased down. When the deceased got up the defendant again knocked him down with the gun, and cried out: "Come on, boys!" Joe Hunt jumped out of the wagon and ran up to them, saying: "G—d d—n him, let me get to him, and I'll fix him." Hunt then cut the deceased with a knife. Witness then heard the deceased call out: "Stevenson, don't you see that Joe has cut me?" Defendant then said: "Go away, Joe; if you don't I will kill you," and Hunt ran back to the wagon.

When the deceased called out to defendant, "don't you see Joe has cut me," he said also to the defendant: "Don't you see that you are holding me to let Joe cut me?" Stevenson then let the deceased go, and ordered Hunt back to the wagon, which order Hunt obeyed. During the whole fight witness was about ten feet distant from the parties, sitting on his horse. The defendant was riding very near the rear end of the wagon, when the deceased passed, just before the fight. In going from the wagon to the defendant and the deceased, when he cut the latter, Joe Hunt passed the witness at very close quarters, the wagon having driven on a few steps after the defendant hailed the deceased. The deceased, who was a stout, healthy man, lived two days after his wounds were inflicted. Witness did not examine his wounds, but saw where he was struck on the head.

Cross-examined, the witness stated that he and the deceased parted at Stoke's gate about sundown. Witness went through the gate and pasture to his home on the John White place. The deceased went on down the road to his place on the Rush Walker farm. Witness remained at home about an hour and started hunting, taking his shot-gun, which was both a breech and muzzle loader, and two

hounds. He went to White's direct and borrowed a load of powder and squirrel shot. He then went to his mother-in-law's house, and staid about one hour. He had no time-piece and could not be exact as to time. Thence he went to Cary Johnson's, meeting the deceased, who was horseback and had his gun, about two hundred yards from Johnson's house. Thence, after a few minutes talk, witness and the deceased went to Overby's. When witness heard the wagon coming, he, deceased and Jake Overby were talking. The deceased and the witness went to meet the wagon, and they had their guns at the time. Witness put his gun down because he was afraid the parties in the wagon might think he and the deceased were after a difficulty. Witness then told the deceased to pass the wagon, and he, witness, going along behind the deceased, asked those in the wagon about his lard, but got no reply. The wagon drove on a few steps after the difficulty began. After the difficulty was over, the defendant called the witness and told him to go after a doctor. Witness did not go, but sent for a doctor. Witness went home and staid there. The witness was about ten steps distant from the parties while the difficulty was going on. The witness was before the jury of inquest and gave in substance the evidence he has given on this trial. He may have said that when the defendant had the deceased down he said " help, boys," instead of " come on, boys," but as a matter of fact the words used were as now stated. The deceased had no gun when he and the witness separated that evening at Stoke's gate. Deceased was on the road to Hartsell's when witness met him that night, before he was wounded. The men in the wagon had been drinking, but witness could not say that they were drunk. The difficulty occurred about two or three hundred yards beyond Maria Blair's house.

Clem Jones was the next witness for the State. He testified that Joe Holmes died from stab-wounds on the night of the 29th or 30th of July, 1883. Witness saw him on the night of July 28, 1883, at a point forty or fifty yards from where he was stabbed, on the road between Maria Blair's and Jake Overby's houses. He lay in the road all night, and the witness lay there with him. Witness was here shown a paper by the prosecuting attorney, which he identified as a paper he wrote on the night of July 28, 1883. When the witness reached the point where the deceased was lying that night, he asked the deceased if he did not want to go home to his wife. The deceased said that he was suffering too intensely to make the effort to get home, but that he wanted the witness to write at his dictation in order that his friends might know how he was killed.

He told the witness that he certainly was going to die, and insisted that witness should write down his statement. Witness wrote it at his dictation. That writing is as follows, the spelling being corrected.

"NAVARRO COUNTY, TEXAS, July 28, 1883.

"The fight was between Joe Holmes and Joe Hunt. It began between Maria Blair's and Jacob Overby's. I was one mile off and heard the cursing. I thought that Jeff Hartsell *was in a fight*. I left home to see what was the matter, and I found Joe Holmes lying in the road. I asked him what was the matter. He said, 'I will tell you all about it,' and he said that John Stevenson 'pulled me off of my horse. I held to my gun until I pulled him off of his horse, and he knocked me down twice. Joe Hunt stabbed me. I am change for you, said John Stevenson. I had not said a word to them. I am dying. I tell you all the truth about it. All I asked John Stevenson was, what have I done to them? and he said: Turn this gun loose. I was not studying about him.'

"CLEM JONES."

[NOTE BY REPORTERS.— The words "was in a fight," italicized by the Reporter, in the above statement, are scarcely legible in the record, but cannot be read otherwise intelligibly, and can only be thus read by an utter disregard of orthographic rules; — the clerk of the trial court, in making out the transcript, having properly copied all the peculiarities of the original document.]

Cross-examined, the witness Jones testified that he did not tell the deceased that he was dying, or was likely to die. Deceased himself told the witness that he was dying. Witness reached the deceased about ten minutes past 9 o'clock on the night that he was wounded, which was the night of Saturday, July 28, 1883. Deceased died on the following Monday or Tuesday. Between his paroxysms of pain, the deceased would say: "John Stevenson hit me on the head, and Joe Hunt cut me. My head don't hurt me. I don't mind my head. Here is where the misery is," putting his hand on his stomach where he was cut. Witness remained with the deceased all night, where he lay in the road, and removed him to his house the next day. Cary Collins appeared as usual. He is naturally a quiet man, and talks little. Witness did not think Cary was drunk. Witness had had some few troubles with the defendant about church matters, but had no prejudice or hard feeling against him. The State rested.

Jeff Hartsell was the first witness for the defense. He testified that in July, 1883, he lived on Rushing's farm, south of Corsicana, on what was known as the Rakestraw road. On the 28th day of

the said July the witness borrowed a wagon, and he, Joe Hunt and Oliver Glenn went to Corsicana in it. They remained in town pretty much all day and started home late in the evening. While in town the deceased and Cary Collins, who were in town on horseback, came to witness and put a sack of flour and a can of lard in the wagon to be transported to some convenient house in the neighborhood in which all the parties lived. The deceased and Collins had whisky at the time, and had been drinking. Witness and his two companions left town before deceased and Collins did, the witness driving the wagon and Hunt lying down in the back part of the wagon. When the witness and his party reached a point near Mr. Melton's, the deceased rode up behind the wagon and asked for a bottle of whisky which he said he had put in the wagon. Hunt told him that he did not put any whisky in the wagon. The deceased called Hunt a liar, and got down from his horse. Hunt got out of the wagon and the two began to fight in the road. Deceased, who was drunk, would advance upon Hunt, and Hunt would push him back. During this little difficulty the deceased pulled out his knife, but put it up when the witness told him to do so. About this time witness saw Mr. Melton coming out of his house and drove off, leaving Hunt and the deceased fighting in the road. Witness stopped the wagon a short distance down the road, and was soon joined by Hunt, when he drove on.

When the party in the wagon reached Mr. Wimberly's, some distance on the road home, witness stopped the wagon, and Hunt went into Mr. Wimberly's to ask for something to eat. He soon returned and got into the wagon. While the wagon was still standing at Wimberly's, the deceased and Cary Collins rode up and talked awhile. Witness did not know whether or not they were then angry. The deceased was quiet. Witness never could tell when Cary Collins was angry, as he invariably talked with a slow brogue. After the deceased left witness and his party at Wimberly's, going in a gallop towards his house, the witness saw no more of him until a few minutes before the fatal difficulty, which was some time in the night. On the way home that night, and while on the road between Maria Blair's and Jake Overby's, witness and his party stopped at the defendant's house, and saw the defendant, who had just ridden up, he said, from horse-hunting. He was in his shirt sleeves. Hunt got out of the wagon and went into the defendant's house to ask for something to eat. He may have spoken to the defendant, but the witness did not think that they held any conversation. The defendant came out to the wagon and witness gave him the flour

and lard, told him who those articles were for, and directed him to charge the deceased and Collins fifteen cents for transportation when they called for them. The wagon staid at the defendant's house about fifteen minutes.

As the wagon left the defendant's house, the defendant came out in his shirt sleeves and said that he would ride over to his mother-in-law's and see if his sister-in-law had made any arrangements about getting to church next day. He followed on close behind the wagon, singing loudly. At a point on the road to witness's house, and the house of the defendant's mother-in-law, about two miles from the defendant's house, and between the houses of Maria Blair and Jake Overby, the party in the wagon met the deceased and Collins, both at the time armed with guns. The deceased rode up to the wagon with his gun held across one arm. When he got very close to the wagon witness hallooed to him, and the deceased changed his course and rode rapidly by, passing the rear of the wagon. Joe Hunt sprang out of the wagon on the side opposite that on which the deceased passed, and the witness drove on some fifty yards before he stopped his team. About this time he heard the defendant ask the deceased: "Why did you snap that gun at me?" Deceased replied: "I have nothing against you." Witness then heard the scuffle, and heard the defendant call for help. Cary Collins all this time was standing off in the woods, whither he had ridden when the deceased came up to the wagon. Witness heard the deceased say that Joe Hunt had cut him. Witness then drove on to Jake Overby's, where he was soon joined by the defendant.

When he arrived at Overby's, the defendant said that the deceased was badly hurt,— that his "guts were cut out," and the defendant, Overby and the witness went back down the road, looking for the deceased. As they got to the place where they expected to find the deceased, and were looking for him with a lamp, they met the defendant (deceased?) walking down the road, who said: "By G—d, it's me; here I am; I am going down to Uncle Jake's." He walked a short distance and lay down. The entire party staid with him a short time. The witness staid with him all night. Witness was there when Clem Jones came. Deceased said nothing about dying, in the hearing of the witness. Hunt was not drunk. He had no whisky. Neither had the defendant taken a drink that night. Witness had a small flask of whisky, and had taken a few drinks. Witness saw the wounds on the deceased. He was stabbed in the stomach and his intestines were visible.

Cross-examined, the witness stated that he and his party remained

but a few minutes at the defendant's house. Hunt went in, but had no general conversation with the defendant, merely saying "howdy." Nothing was said to the defendant at that time about the previous difficulty with the deceased. The defendant did not even know that the deceased and Collins had been to town until the witness told him about the flour and lard. Witness slept some, off and on, while he and Clem Jones were watching with the deceased in the road. When the deceased passed the wagon, just before the fatal difficulty occurred, the witness drove the wagon on in a walk. When the deceased came up to the wagon with his gun presented, Joe Hunt jumped out of the wagon and ran into the brush. Witness distinctly heard the defendant call for help after the scuffle commenced. Hunt and the deceased did not make friends at Stoke's gate; the wagon did not stop at that point. Witness did not hear the snap of a gun at the time defendant asked deceased why he snapped the gun at him. It was possible that, at the coroner's inquest, the witness testified that defendant said: "Boys, I have got Joe Holmes's gun, and want help."

Re-examined, the witness stated that he was induced to call to deceased when he rode up to the wagon just before the fatal encounter, by reason of the manner in which he held his gun. "I was afraid he would hurt me." When Cary Collins rode up to the wagon at Wimberly's, he asked about the recent fight between Hunt and the deceased, and the witness told him about it. The witness was absolutely positive that the defendant and Hunt had no conversation at defendant's house that he, witness, did not hear, and he knew that defendant and Hunt did not discuss or speak of Hunt's previous difficulty with the deceased. Witness nor any of the others with him expected to meet deceased and Collins that night. They met these parties after they had passed the houses of each of them. Cary Collins and the deceased were brothers-in-law.

Elias McElroy testified, for the defense, that he and W. C. Petty left Corsicana about 4 or 5 o'clock on the evening of the homicide. The deceased and Cary Collins rode with them to a point near witness's house, when they rode on ahead in a dead run. The deceased was very drunk, and Collins had been drinking.

J. F. Melton was the next witness for the defense. He testified that he lived at the Hulver place on the Rakestraw road, about six miles from Corsicana. He was at home on the evening of July 28, 1883, and on that evening he saw a wagon standing in the road near his house, and two colored men near it, fighting. Witness did not know them, but, as he wanted no fighting so near his house, he

went out to see about it after watching the parties awhile. The men who were fighting he discovered to be the deceased and Joe Hunt. The deceased appeared to be very drunk. He would stagger up to Hunt and Hunt would push him down. Hunt did not seem to be hurting the deceased. After this manner of contest was kept up for some time, Hunt, who had a whip in his hand, doubled the lash back to his hand, making a loop which he placed over the deceased's head and dragged him about. Witness made the parties stop, and Hunt went to and got into the wagon. Deceased remained on the ground until Cary Collins came up, when he and Collins rode off together towards Wimberly's. The deceased did not seem to be trying to hurt Hunt. In fact the deceased was too drunk to do much of anything. Cary Collins told witness that the difficulty would not be resumed. This all occurred before sundown.

Ben Wimberly was the next witness for the defense. He testified that he was at home on the evening of Saturday, July 28, 1883. About sundown Jeff Hartsell, Joe Hunt and Oliver Glenn drove up to witness's gate in a wagon. When the wagon stopped Joe Hunt came into the house and appealed to witness for protection from the deceased. He went back to the wagon and got in, and shortly afterwards Cary Collins and the deceased rode up. Both of these parties appeared to be angry, and they said, in the hearing of Joe Hunt, that they would kill him before daylight. The parties disputed at the wagon for some little time, when witness told them they could have no row there. Collins and deceased rode off together, ahead of the wagon, and stopped at Stoke's gate, about three hundred yards distant from the witness's house. The wagon followed, and the witness thought it, too, stopped at Stoke's gate. The parties seemed to be talking at the gate. The deceased appeared to be drunk, and both he and Collins appeared to be mad.

Cross-examined, the witness said that he did not think he was before the grand jury on this case, though he may have been, and his name may appear on the indictment as one of the witnesses for the State. The witness at no place and at no time asserted that the defendants in this case ought to be punished. The witness had never said that he was a good State's witness, and wanted to see the defendants prosecuted. He did not think he had ever been subpoenaed in this case, though he may have been. When deceased and Cary Collins threatened to kill Joe Hunt, they were on their horses in front of the witness's house. Witness's wife and George Wimberly were present.

Oliver Glenn was the next witness for the defense. He testified

that he went to town on July 28, 1883, with Jeff Hartsell and Joe
Hunt, in a wagon. They left town on their return late in the even-
ing, Hartsell driving. Witness was in front and Joe Hunt behind
in the wagon. When Mr. Melton's house was reached, the wagon
was overtaken by the deceased, and he and Hunt had a fight in the
road, after which Hunt got into the wagon, and the wagon was
driven on to Mr. Ben Wimberly's house. Hunt went into Wim-
berly's house, returned and got into the wagon again. The deceased
and Collins soon came up on their horses. They looked mad,
cursed and swore a great deal, and said that they would kill Joe
Hunt before sunrise next morning. From Wimberly's, without stop-
ping at Stoke's gate, the witness and his party went on to the de-
fendant's house, the deceased and Collins traveling on ahead. The
wagon did not stop long at the defendant's house. Hartsell put out
some flour and lard he had brought from town for the deceased and
Collins. Joe Hunt went into the house to beg something to eat.
The defendant came out on his horse and said that he would ac-
company the wagon as far as his mother-in-law's house. He had no
gun and was in his working clothes. The defendant, on horseback,
rode behind the wagon, making a noise,— singing a hymn. After
going perhaps a mile, they met the deceased and Cary Collins, one
on each side of the road, and both armed with guns. The deceased
came up along side of the wagon, and as he did so Joe Hunt
jumped out of the wagon on the opposite side, and ran into the
bushes. Witness kept talking to Cary Collins, but Collins edged off
towards the brush, talking or mumbling to himself. Witness then
heard a cap explode and heard defendant say : " What did you bust
that cap at me for?" and then heard him cry out: "Help, boys."
Witness could not see Collins during this time, but could hear him
off in the bushes. Witness did not state these facts before the cor-
oner's inquest. He was sick that day, and said but little.

Cross-examined, the witness stated that he did not testify to all
he knew before the coroner's inquest, for the reason, as stated, that
he was very sick. He said nothing on that occasion about the
threat to kill Hunt, or about Collins having a gun. He did not tes-
tify on that occasion about the bursting of the cap or the cursing at
Wimberly's. Witness was not drunk on July 28th. He had had
one drink of whisky. It was not too dark for witness to see Cary
Collins's gun. What he meant by its being too dark for him to see
Cary Collins was that it was too dark for him to distinguish Collins
after the fighting began.

Cary Johnson was the next witness for the defense. He testified

that on the night of the homicide he was at home, lying down, somewhat sick from recent chills. Collins and the deceased rode up to witness's house that night, and called witness out, and asked him if a wagon had passed that night. Witness replied in the negative. Collins had a bottle of whisky with him and gave the witness a drink. He then asked for a string with which to tie his gun on his saddle. Witness made one of his children get a string and Collins used it in tying his gun on his saddle. Deceased had his gun in his hands. They talked perhaps fifteen or twenty minutes and left in the direction of their homes. Cary Collins was riding a black pony and the deceased a roan horse. Witness went into his house and lay down. Within a few minutes one of the witness's children ran in and said: "There goes Cary Collins and Joe Holmes." Witness looked out and saw two horsemen going south in a lope. One was riding a dark or black, and the other a light or red roan horse. Both had guns. They were going towards Overby's house, and away from the houses of Collins and the deceased. They were fifty yards distant when witness saw them last. It was then dark. Witness knew them by the color of their horses.

Cross-examined, the witness said that he knew the horses he last saw to be a black and a roan, by one being dark and the other light. It was not a real dark night, but was dark. The riders were going south down the lane by Melton's, which led into the road to Overby's.

Calvin Blair was the next witness for the defense. He testified that he lived at his mother's house, which was situated on the road about one hundred and fifty yards from the point where the fatal difficulty took place. About dusk on that evening Cary Collins and the deceased rode up to the fence and called, and the witness went out to them. Collins had a shot-gun and the deceased an Enfield. Cary Collins was riding a black pony and the deceased a roan horse. They asked the witness if a wagon had passed that night. Witness replied in the negative. They then told witness that if a wagon did pass that night to say nothing about their having been at the house. They had no dogs with them. Witness did not see them drink anything. They rode off down the road towards the point where the difficulty subsequently occurred. Witness went back into the house, and after a while he heard a wagon go by. He heard the defendant singing. He was familiar with the defendant's voice, and recognized it. A few minutes after the wagon went by, and while the witness was eating his supper, he heard a cap burst. Some time later in the night the witness heard that the deceased

had been cut. Cary Collins came to the house and asked witness if he had seen the deceased. Witness replied that he had not, and he said: "Well, I reckon the boys have killed him." The witness did not know who was in the wagon that passed his mother's house on that night.

Cross-examined, the witness said that the cutting took place about one hundred and fifty yards distant from the house. Witness was eating his supper in the house when the gun snapped. Witness could and did hear it. Witness could not say that Cary Collins and the deceased were drunk or sober when they came to the house. The cutting occurred on a starlight night. The wind was not blowing. The cutting took place nearly in the rear of the house occupied by the witness, which was a box house with one door.

G. A. Rakestraw testified, for the defendant, that while sitting on the back gallery of his house, late on the evening of July 28, 1883, he heard some one ride past his front gate at an unusually fast gallop. Such occurrences being very unusual, he was attracted to his front door just in time to see that the rider was the deceased. He rode a roan horse, and had his gun with him. He came from the direction in which he lived, and was going in a direction which, if he continued, would take him into the Corsicana road below the witness's house. The hour was nearly dark. Witness saw the deceased next morning about an hour after sunrise. He was then in a wagon and was being taken home. Witness went out and stopped the wagon, and found the deceased stretched in it in about a half reclining and half sitting position. He spoke to deceased, saying: "How are you, Joe?" Deceased, who was a conspicuously polite and respectful negro, tipped his hat and replied: "I am pretty well, I thank you, sir." From his appearance and manner the witness could not believe him to be a dying man. Witness did not examine the wound, but did not suppose it had penetrated the bowels. Witness knew Oliver Glenn. Oliver is the son of George Glenn, who is the father-in-law of the defendant. The defense rested.

Cary Collins was the first witness called in rebuttal by the State. He testified that, as a matter of absolute fact, the deceased and Joe Hunt did make friends and shake hands at Stoke's gate. No threats against Hunt were made by either the witness or the deceased at Wimberly's or anywhere else. Witness and deceased passed Maria Blair's house that evening, but they did not stop. They did not see Calvin Blair, and they had no conversation with him. The parties in the wagon had been drinking and were drunk

at the time of the fatal difficulty, or at least one would judge so from their conduct and noise. Witness did not talk to Oliver Glenn while the difficulty was in progress, nor did he talk or mumble to himself. Witness explained his position before and during the difficulty as he did on his examination in chief.

Cross-examined, the witness stated that he rode a black pony and the deceased rode a roan horse on the night of the fatal difficulty. Witness had a small flask of whisky with him on that night, and was drinking some. The deceased and the witness were brothers-in-law, and were together during the day, except when deceased rode ahead of witness to Melton's place.

Jake Overby was next introduced by the State. He testified that after dark on the fatal Saturday evening, the deceased and Cary Collins came to his house and inquired if a wagon had passed and had left a bag of flour and a can of lard for them. Witness replied that no such wagon had passed. About that time the witness heard a shout up the valley, and Collins and the deceased rode off up the valley, meeting the wagon. Witness advised them to do so, and to get their things, as his wife was sick and he did not want the noisy crowd about his house. Later in the night Jeff Hartsell and the defendant came to the witness's house and informed the witness that the deceased was lying up the valley, badly cut. Witness went with Hartsell and defendant to look for the deceased and met him in the road.

R. W. Walton was next introduced as a witness for the State. He testified that in July, 1883, he was justice of the peace of precinct number one of Navarro county, and as such officer held the inquest over the dead body of Joe Holmes. He examined the body and saw a scratch on the head and a cut in the upper part of the stomach, through which the entrails were protruding. The body was very much swollen. The inquest was held in Rakestraw's field on July 31, 1883. Witness was here handed the written testimony taken before that inquest, and proceeded with his testimony as follows:

" Jeff Hartsell and Oliver Glenn were before me on that examination or inquest. They were sworn by me as witnesses, and by me were directed to tell all they knew about the facts and circumstances of the killing or death of the deceased. What each of them then and there stated was by me reduced to writing, and they signed the written statements. At the time of this examination, I asked the witness Oliver Glenn these questions: Are you deaf? To which he replied: ' No, sir.' Are you drunk? To which he re-

plied: 'No, sir.' Are you crazy? To which he replied: 'No, sir.' He was not sick. After his written statement was completed, witness asked him if it contained all he knew about the killing, and he said that it did." The sworn statement of Oliver Glenn before the coroner's inquest was then read in evidence by the State. It is as follows:

"Oliver Glenn, being sworn, says: 'We called at John Stevenson's house to leave the flour and lard belonging to the deceased and Cary Collins, and then Stevenson went along down the road with us, going to his mother-in-law's, when we passed Joe Holmes with his gun, holding up his hand, and Cary Collins. Stevenson was behind us and I heard him say 'come on, boys.'

His
"Oliver + Glenn."
mark.

Over the defendant's objection the State was next permitted to read the closing part of the written testimony of Jeff Hartsell as taken before the coroner's inquest. It is as follows:

"  .  .  .  I heard John Stevenson say: 'Boys, I have got Joe Holmes's gun, and I want help. I heard the deceased say that Joe Hunt had cut him. I have not seen Joe Hunt since. I never saw anybody cut the deceased."

The witness Walton, on cross-examination, was requested to examine the sworn statement of the witness Cary Collins as reduced to writing by him at the inquest. He did so, and stated that the said statement was made under oath by Collins, reduced to writing by witness, and signed by Collins. As directed by the counsel for the defense, the witness then read from Collins's sworn statement the following extract:

"About the time the deceased got past the hind end of the wagon, Stevenson hailed and asked if that was not Joe Holmes. The deceased said: 'Yes.' Stevenson at that time said: 'Yes, and you have got a gun; what are you doing here with that gun?' The deceased said: 'I have got nothing against you, Stevenson.' When the deceased said that, then Stevenson said: 'Oh but I am a man,' taking hold of the gun, and after having pulled him off the horse, he twisted the gun out of his hand, and struck him over the head with it and knocked him down. He struck him the second time with the gun and hallooed: 'Help!' At that time Joe Hunt jumped out of the hind end of the wagon, and said: 'God durn him, let me get to him and I will fix him.' I then saw Joe Hunt running at deceased. He struck him, as I thought, and stabbed him, and immediately after I heard Joe Holmes say: 'Stevenson, don't

you see that Joe Hunt has cut me?' and when the deceased said that, Stevenson said: ' Go away from here, Joe; if you don't I will kill you.' Stevenson then came to me and told me to go after the doctor. Joe Hunt went and got into the wagon, when Stevenson told him to go away. I asked Stephenson where Holmes was cut, and he said that his guts were cut out. All of this happened June (?) 28, 1883, in Navarro county, Texas."

Resuming (on his cross-examination), the witness Walton stated the deceased's wound was not, in his opinion, necessarily fatal, and death would have been averted by proper attention. The cut was sufficiently large to let the entrails out, but not large enough to let them back, and being out they began to swell, and inflammation ensued. Witness, however, was not a physician. On Sunday morning after the difficulty, the defendant came to Corsicana and hunted the witness up and and reported the difficulty. Witness told him to go home. The next day the defendant came to town to attend the examining trial of Joe Hunt, without being served with process, and was arrested while in town.

The motion for new trial comprehended the questions discussed in the opinion.

*Beale & Autry* filed an able and exhaustive brief for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

HURT, JUDGE. Appellant John Stevenson and one Joe Hunt were jointly indicted for the murder of Joe Holmes. A severance being granted, Stevenson was tried and convicted of murder of the second degree, his punishment being assessed at five years' confinement in the penitentiary. (The Reporter will insert the facts.)

It will be readily perceived from the evidence that a charge upon the rules of law applicable to a case of self-defense was demanded, and the learned judge below so viewing the case submitted the following charge: "Every person is permitted by law to take the life of his assailant when it becomes necessary to do so in order to save his own life or to avoid the infliction upon himself of serious bodily injury. But to justify homicide in such case it must necessarily appear by the acts, or by the words coupled with the acts, of the person killed, that it was his purpose and intent to either kill the person killing or to do him some serious bodily injury; and the killing must take place while the person killed was in the act of taking the life of the person committing the homicide, *or of doing him*

*some* serious bodily injury, or of some act done by him evidently showing such intention. The attack upon the person, in order to justify homicide, must be such as produces a reasonable fear or expectation of death or some serious bodily injury; and it makes no difference whether the danger is real or imaginary if it has the actual appearance of being real, and the person who is so violently attacked is not bound to retreat in order to avoid the necessity of killing his assailant."

The second subdivision of article 570, Penal Code, requires that the killing take place while the person killed was in the act of committing the offense, or after some act done by him showing evidently an attempt to commit such offense. The charge requires the jury to believe that " the killing took place while the person was in the act of committing the offense, or *of* some act done by him evidently showing such intention." The defect is in the omission of the word *after* some act done.

If defendant killed Holmes while he was in the act of taking his life he would be justified, or if the killing took place after Holmes had done some act showing evidently an intention to take his life or do him some serious bodily injury he would also be justified. The act done by the party killed must show that he had the intention to kill the defendant or do him some serious bodily injury at the time defendant killed him. The charge of the court was calculated to limit the defendant, in order to his justification, to kill Holmes while *in the act* of taking his life or doing him some serious bodily injury, or in the act of doing some *other act* by the deceased.

Again under the first subdivision of article 570, to justify, " It must *reasonably* appear by the acts, or by words coupled with the acts, of the person killed, that it was the purpose and intention of such person to commit one of the offenses above named." Upon this subject the court charged: " But to justify homicide in such case, it must *necessarily* appear by the acts, or by words coupled with the acts, of the person killed, that it was his purpose and intent to either kill the person killing or to do him some serious bodily injury." " Reasonably " is defined by Webster as follows: In a reasonable manner; in consistency with reason. " Necessary " as defined by Webster, unavoidable; "necessary," such as must be, impossible to be otherwise, not to be avoided, inevitably. " Death, a necessary end, will come when it will come." It is quite evident from these definitions that there is a vast difference between *reasonably* and *necessarily*. If it must *necessarily* appear from the acts, or words coupled with the acts, of the party killed that it was his pur-

pose to commit one of the offenses named in the article before a person can be justified in killing his adversary, then indeed appearances, whether reasonable or not, would have nothing whatever to do with the case. We think that the court erred in the charge upon self-defense in the particulars indicated.

Upon the subject of principals the court charged the jury in effect that, if they believed from the evidence that defendant and Joe Hunt, acting together in such manner as to make him a principal, did strike with a gun and cut with a knife the said Holmes, causing thereby the death of Holmes, and that said acts were prompted by malice express, they should find defendant guilty of murder of the first degree, but if upon implied malice they should find defendant guilty of murder of the second degree. The proposition contained in this charge is correct.

If two or more conspire and confederate to commit an offense, and such offense is committed, all present are guilty as principals, and each party is responsible for collateral acts growing out of the general or common design, but not for independent acts growing out of the particular malice of individuals. Let us concede, for the argument, that there was some proof tending to show a common design between defendant and Hunt (which is very doubtful), what was the purpose of the conspiracy? Was it to kill Holmes? What was its scope? Did it directly or collaterally embrace the killing of Holmes?

Now, in criminal trials presumptions should be based upon proved facts. This record nowhere furnishes the slightest fact from which we can assume a common design on part of defendant and Hunt to kill Holmes, except what occurred at the time of the homicide. It is true that Hunt and Holmes, while on the way from Corsicana, but before defendant joined the wagon, had engaged in an ordinary fist fight. There is no evidence in the record, showing that defendant had been informed of this, or knew of any bad blood between the parties; hence the legal questions applicable to this case are those which arise upon the facts immediately attending the homicide.

Two theories are presented by which defendant is sought to be held culpable. 1st. That he had been informed of the difficulty between Hunt and Holmes, and had conspired with Hunt to kill Holmes. This is not only without support in evidence, but, under the facts of this case, is evidently preposterous. The wagon with and in which were Hunt and defendant had separated with Holmes several miles back on the road leading from Corsicana, Holmes leav-

ing the main road going to his home.   How it could be possible for Hunt and defendant to know that Holmes would, after dark, turn up ahead of them with a gun, we cannot comprehend.

The second theory is that, at the time defendant first saw deceased with the gun, he seized his gun and, unprovoked, proceeded to strike and beat him in a violent manner, and, while so assaulting deceased, called Hunt to aid him in the violent and dangerous onslaught upon deceased; and that, therefore, whether he knew of Hunt's intention to, or intended him to stab Holmes, or whether there was or was not a common design to kill Holmes, being thus engaged in this violent assault and bringing Hunt in the affray himself, he is and should be held responsible for Hunt's acts; and if this violent and dangerous assault was made in pursuance of a conspiracy between Hunt and the defendant, the parties engaged may be guilty of murder of the first degree or of the second degree, depending upon the circumstances.   But, suppose that the defendant had been informed of the difficulty between Hunt and Holmes, and had not espoused the cause of Hunt, but, meeting up with Holmes armed, under the circumstances of this case believed that it was his purpose to kill Hunt, or suppose that the defendant from the conduct of Holmes believed that it was his purpose to shoot him, and so believing attempted to disarm Holmes, and that he seized the gun and struck Holmes; that all that he did was intended to restrain and prevent him from committing a felony upon Hunt or himself, and while thus engaged in disarming Holmes he called for help, and Hunt ran up and stabbed Holmes, evidently he would not be guilty of the homicide.   This theory of the case should have been submitted to the jury.

Again, suppose, to effect his purpose in restraining Holmes from committing a felony, defendant had gone beyond what was necessary in striking Holmes with the gun, but that all that was done by him was for such a purpose, and that his call for help was not intended to procure aid in his violent assault and battery upon Holmes, but to obtain efforts to disarm him or to restrain him so that a felony be prevented.   Under this state of case we do not think he would be responsible for the fatal wound inflicted by Hunt, prompted thereto by his (Hunt's) instance.   And this phase of the case should have been charged to the jury.

For the errors in the charge relative to the law of self-defense, and because of the omission in the charge in the particulars indicated, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

[Opinion delivered March 14, 1885.]